UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | Criminal No. 18-10001-WGY |
| | ) | |
| JAVONTE ROBINSON | ) | |
| KEVIN SMITH | | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On February 22, 2018 and February 26, 2018, counsel in this case consummated the plea agreements that have been submitted to the Court under Rule 11(c)(1)(C). They call for sentences of a year-and-a-day (ROBINSON) and 18 months (SMITH). Both of these recommended dispositions are at the low end of the properly calculated Guideline Sentencing Range. ROBINSON PSR at ¶101; SMITH PSR at ¶140.

The government urges the Court to accept the pleas and to impose the guideline sentences that they recommend. Those sentences reflect an attempt to balance the seriousness of drug dealing in a public housing development against the relatively modest amount of drugs involved and the Defendants' limited criminal histories. Because of the minimum 6-year Supervised Release, acceptance of the pleas will result in the Defendants being under criminal justice supervision for a period of 7 years (ROBINSON) and 7 1/2 years (SMITH).

In many cases, agreement as to the period of incarceration would end the important issues at sentencing. But not here. The government believes that the special Supervised Release conditions it is recommending (including individualized Associational and Geographic Restrictions designed to keep the Defendants out of the Development and away from historic criminal associates) are extremely important provisions in the overall

sentence and will therefore address those issues in detail.

To understand why the Defendants should be restricted from the area of the Mildred C. Hailey Apartments (formerly known as the Bromley Heath Housing Development) and should be precluded from being in the company of historical associates who have felony convictions and/or are gang affiliated, it is critical to understand what prompted the investigation at the Hailey Apartments and what ROBINSON and SMITHS' involvement in it was. Because both Defendants were long-time fixtures at Bromley-Heath, where they sold street level amounts of crack cocaine to an ATF CW on multiple occasions, the government urges the Court to restrict them from entering the area while on Supervised Release and from being in the company of the convicted felons and others identified on the proposed Associational Restrictions attached as Exhibits 5 (ROBINSON) and 6 (SMITH).

## THE CONCENTRATION OF CRIME AT THE MILDRED C. HAILEY APARTMENTS[1]

The Mildred C. Hailey Apartment Complex ("the Development" or "Bromley-Heath") is located in Jamaica Plain, Massachusetts.  It is one of many housing facilities owned and/or operated by the Boston Housing Authority ("the BHA"), a public authority that provides housing for low and moderate-income residents.  Notwithstanding the persistence of drug offenses and violent crime that occur at Bromley-Heath, there have been and continue to be waiting lists of individuals who seek to live in Bromley-Heath because of the other opportunities and amenities it offers for them and their families.

One of the things that this investigation demonstrated is the impact that drug

---

1  All of the facts stated herein come from the un-objected to provisions of the PSRs and the detention affidavit of ATF Special Agent Keltar Mui filed at the outset of the case.

trafficking and related crime and gang-activity and violence has on the residents of Bromley-Heath, the vast majority of whom have nothing to do with (and are in fact victimized by) the criminal activities described below.  During controlled purchases of narcotics made during the course of the underlying investigation, consensual recordings and surveillance made it clear that innocent residents of the Development are frequently confronted with drug dealing (often being conducted by individuals who had been ordered out of Bromley-Heath by the BHA and the BHA Police Department) in the hallways or the immediate environs of the apartment buildings where they and their children live. See Photos attached as Exhibit 1 (resident running up stairs after walking into drug deal being conducted by Target James Finch; photo of Kevin Smith conducting deal inside 279 Centre Street in the Mildred C. Hailey Apartment on June 14, 2016; and photo of Javonte Robinson in hallway of 279 Centre Street in the Mildred Hailey Apartments during uncharged August 25, 2016 sale).  Hence, like all of the ongoing efforts to curtail drug trafficking and the violence it helps to breed in this area, a principal purpose of the underlying investigation is to curtail such crimes taking place inside the Development and thereby enhance public safety and the quality of life for its residents.

Bromley-Heath includes approximately 10% of the residents in BPD's District 13. It nevertheless accounts for a far greater amount of that District's crime.  According to information developed by BPD's Boston Regional Intelligence Center ("the BRIC"), for example, between January 1, 2017 and December 10, 2017, the area of Bromley-Heath accounted for 36 incidents of shots fired, 8 non-fatal shootings, 1 homicide, 20 drug arrests, 25 robberies and 36 confirmed shots fired.

The materials attached as Exhibit 2 document the role that the Development has

played in the crime committed in District E-13 between January 1 and December 10, 2017. These charts, prepared by BPD's BRIC, demonstrate that, in the listed categories of crime (shootings, robberies and attempted robberies, confirmed shots fired, drug related arrests, and firearm arrests), the area encompassing the Development has been plagued by high concentrations of arrests and reports of such incidents.

There may be various explanations for the concentration of violence at Bromley-Heath. However, it seems undeniable that the Project also has been the locus of significant drug activity. This is believed to have substantially contributed to the levels of violence at the Development and helped to focus investigative strategies in the underlying investigation.

Another factor believed to be contributing to the violence at Bromley-Heath is that it is the location of one of the city's active gang disputes involving the Heath Street Gang ("Heath St."). According to information generated by the Boston Police Department, Heath St. is one of the larger gangs in the city with nearly 100 individuals believed to be actively associated with it. For many years, Heath St. has been involved in an ongoing dispute with a group from the area around Holworthy Street in Roxbury known as "H-Bloc" (as well as several other more sporadic disputes with other area groups most recently including the Orchard Park Trailblazers) that has been one of the most active disputes in the city. See "Prosecutor: Shooting Victim, 18, Mistaken for Gang Rival" (Boston Globe April 29, 2009)(discussing Commonwealth's case against a Heath Street member alleged to have shot a Belmont High School student under the mistaken belief that he was an H-Block member, in which prosecutor told a Suffolk County jury that, at of the time of the 2009 trial, there had been 50 shootings between members of Heath Street and H-Bloc).

Of course, crime committed in and around the Development is not limited to the major crime categories already discussed. In addition, residents of the Development are also confronted with quality of life offenses such as trespassing, public drinking and drug use, disorderly conduct and prolific use of (mostly illegal) dirt bikes or other public disturbances.   Most of these crimes are committed by individuals (many of whom are associated with the Heath Street Gang but do not necessarily live in the Development) who hang around the Development in large groups often taking over street corners, hallways, building entrances, play areas, or parking lots, thereby forcing residents to go around them to get to their homes. Residents of the Development frequently express concerns for their safety and the quality of life within their community.   Both the buys that were made and surveillance conducted during the course of the investigation have corroborated these complaints.

## THE INVESTIGATION

Based on all of the foregoing, the current investigation was initiated in 2016.   Its principal goal was to attack gun and drug trafficking in Bromley-Heath with particular emphasis placed in two areas: (i) individuals who were believed to be particularly active in street and lower-level wholesale drug trafficking in the Project; and, (ii) individuals who were believed to be trafficking drugs and who were independently involved in the violence and gang disputes.   Many of the Targets are also individuals who have persistently hung around the Development committing the kind of quality of life offenses described above.

To accomplish these goals, cooperating witnesses ("CWs") were used to make street-level drug purchases of crack cocaine, which appeared to be a drug of choice in the Development.   Purchases of drugs (and two firearms) were captured on audio and video

recording equipment and were surveilled by law enforcement to the extent possible.  Many meetings and/telephone calls leading up to the meetings were also consensually recorded.

On January 3, 2018, seven federal criminal indictments were returned charging nine individuals with federal drug and/or firearm charges. All but two of the nine individuals have been charged with conducting drug transactions either in or within 1000 feet of the Mildred Hailey Apartments in violation of 21 U.S.C. §§841 and 860.  The first of the remaining two Targets (FRANKLIN SAFO-AGYARE,) sold a gun less than 1000 feet from the Development while the second (an identified Heath Street member KENDRICK TATE) sold drugs and a gun not far from where he was then living in Chelsea.

The investigation confirmed many of the premises on which was initiated.  First, it confirmed that Bromley-Heath is plagued by open-air drug trafficking that represents a threat to the well-being of all Project residents.  During the investigation, there were few days in which CWs tried but failed to buy crack cocaine from Targets inside the Project.  Many of these (including the sales made by ROBINSON and SMITH) then took place within the Project, including many deals done in hallways or entrances where other residents must necessarily pass to go in and out of their homes, often with their families.  See photos attached as Exhibit 1.

The investigations also confirmed the obvious connection between the Targets and Bromley-Heath.  As set forth above, many Targets list (or at one time listed) residential addresses within the Project.  All but one of the drug purchases took place either in or within 1000 feet of Bromley-Heath. All but one of the Targets has also been identified as a member of the Heath Street Gang by BPD.

### THE CHARGED SALE OF COCAINE BASE

The government believes that SMITH and ROBINSON are two of the individuals who have contributed to the crime and have helped damage the quality of life for Bromley Heath's residents. SMITH and ROBINSON have both been identified as being associated with the Heath Street Gang by BPD's Boston Regional Intelligence Center.  Irrespective of whether they are currently Heath Street members, their constant presence in and around the Development is confirmed by BPD Incident Reports and FIOs.[2] See Summary of BPD Reports and FIOs attached as Exhibits 3 and 4.[3]  Specifically, SMITH and ROBINSON has either been FIO'd or captured in Incident Reports as being in the company of each other and with the following Heath Street members who were also Targets in this investigation and who have also pled guilty (or are expected to plead guilty) to drug and/or gun offenses committed in the area of the Development: CERONE DAVIS; DOMINIQUE FINCH; JAMES FINCH; JARROD SIMMONS; and JOSEPH SIMMONS.   Id.[4]

---

3 The government notes that, in the recent case of United States v. Cortes-Medina, 819 F.3d 566 (1st Cir. 2016), the First Circuit expressed concern over a sentencing court's reliance on a "record of multiple arrests and charges without convictions unless there is adequate proof of the conduct upon which the arrest or charges were predicated."819 F.3d at 570.  Here, the government is not relying on the mere fact of arrests that did not mature into convictions to enhance the Defendants' sentence but rather only on the location of arrests and other interactions the Defendants have had with the police to support the Associational and Geographic Restrictions that the government is seeking.

4 BPD records indicate that SMITH had been FIO'd 154 Times. Those FIO's included more than 100 that took place in or around the Development and 38 when SMITH was in the company of other Targets, found in groups of up to 15.

BPD records indicate that ROBINSON has been FIO'd 81 times. Those FIO's included more than 50 that took place in or around the Development and 24 when ROBINSON was in the company of other Targets, found in groups of up to 15.

The Summary of Incident Reports and FIOs for these Defendants are attached as Exhibits 3 and 4.

The Defendants' real connection with the Bromley Heath Investigation, however, comes from the videotaped crack sales they made while in the area of the Development on March 24, 2017.

At approximately 1:30 pm on March 24, 2017, agents met with the Cooperating Witness in preparation for a controlled buy of crack cocaine from KENDRICK TATE. In the event that TATE was unavailable, agents also had the CW call SMITH, (from whom the CW had previously purchased crack cocaine), to arrange to buy drugs. Although the operation was originally intended as a controlled buy from one of these two men, the CW was diverted part of the way through the operation by SMITH and sent by him to meet JAVONTE ROBINSON for a controlled purchase.

While meeting with the agents, the CW called SMITH, who was at a nearby liquor store. The CW was then instructed the CW to pursue a controlled purchase from SMITH. After the CW sent a text to SMITH requesting a "half basket," (1.75 grams of crack cocaine), SMITH called and chided him for including specific references to drugs on a text because of law enforcement's ability to intercept them. However, he also told the CW that he had a source with $175 of "soft cocaine" to which the CW replied that he only needed $100 "hard" (i.e., crack cocaine). SMITH told the CW to call him when he was out on the street and he would "grab it." A short time later, the CW called SMITH again and asked him "grab that thing for him right now." SMITH promised to have the narcotics for the CW in fifteen to twenty minutes.

The agents thereafter searched the CW for contraband, equipped the CW with an audio/video recorder and transmitter, and gave him $100 in pre-recorded ATF funds. During this operation, the CW was also driving a car equipped with electronic surveillance

8

equipment.

The CW departed the staging area in the undercover vehicle. Shortly after leaving, the CW received a phone call from SMITH that instructed him to go to 944 Parker Street (inside the Mildred Hailey apartment complex) to link up with ROBINSON. After arriving at 944 Parker Street, the CW parked his car in front of the Mildred C. Hailey Apartments and called the number of the person he was supposed to link up with to say that he arrived. The CW then recognized ROBINSON as he approached his car.

The CW pushed open the front passenger door of his car and greeted ROBINSON, who was dressed in a gray hooded sweatshirt and gray sweatpants. As soon as he sat down, ROBINSON pulled a clear plastic bag containing out of his left pocket and held it out for the CW. The CW then took the drugs and examined them after which the CW then handed ROBINSON a wad of cash. After ROBINSON counted the money and exchanged a few more words with the CW, he climbed out of the vehicle and left.

The CW then drove back to the pre-arranged meeting location under surveillance. On arrival, the CW turned the electronic surveillance equipment and one clear plastic bag containing a white rocky substance that was subsequently determined to contain 1.6 grams of cocaine base.[5]

## SUPERVISED RELEASE

The government cannot overstate the importance of Supervised Release conditions in this

---

5  Both Defendants were also involved in buys not charged and have accepted responsibility for between 2.8 and 5.6 grams of cocaine base

case.  The special conditions recommended below are intended both to protect public safety and the residents of Bromley Heath from further crimes from these Defendants and also to help the Defendants to obtain the services and assistance they need to help insure that this offense will be their last.

The government also believes that the Defendants should each be placed on Supervised Release for the minimum period of 6 years and that the Supervised Release should include special conditions designed to help ensure that the Defendant does not revert to his past ways in order to protect the community and to protect the Defendant from himself.

### SUPERVISED RELEASE CONDITIONS PROPOSED FOR JAVONTE ROBINSON

#### A. ROBINSON should be required to reside at an RRC if a suitable residence is not available

Based on the PSR, it appears that that ROBINSON will have a viable residence upon release. PSR at ¶76.  If he does not, he should be required to stay in a Residential Center until a suitable residence is found.

#### B. Curfew

The government also recommends that ROBINSON be subject to a 9 p.m.-7a.m. curfew for the first 6 months of Supervised Release after he is released to the street.  See, e.g., "Maximum Impact: Targeting Supervision on Higher Risk People, Places and Times," Pew Center for the States Public Policy Brief (March, 2009) (concluding that Probationers are "at the highest risk of re-arrest during the first few months on community supervision," that arrest rates after 15 months were substantially lower, and thus recommending that probation resources be "front end loaded" to achieve maximum effect).  The Probation Office should have the power to relax the curfew (which should be enforced by electronic monitoring) for school, employment, or

other legitimate reasons.

### C. Substance Abuse Treatment

ROBINSON should be tested for drug use and be required to go to drug counseling if directed by Probation. See PSR at ¶¶ 88-93 (historic drug use and interest in treatment); 84 (historic mental health issues).

### D. Mental health counseling

The Court should require that ROBINSON participate in mental health counseling if directed by Probation. See PSR at ¶ 84 (historic mental health issues).

### E. Associational and Geographic Restrictions

The government also believes that Associational and Geographic Restrictions will help to assist SMITH and ROBINSON upon their release from prison and help protect public safety and the Bromley-Heath Community. Copies of the proposed ROBINSON restrictions are attached as Exhibit 5.

The rationale for such restrictions has been explained as follows:

> Recidivism is due to offenders' retaining criminogenic motivation or propensity and their having access to opportunities for crime. Thus, to reduce re-offending, an important task for a probation or parole agency is to provide or place offenders into treatment programs, based on the principles of effective rehabilitation, that diminish their propensity for crime. *The other task, however, is for probation and parole officers to reduce offenders' access to crime opportunities.*

Cullen et al, "Environmental Corrections–A New Paradigm for Effective Probation and Parole Supervision" 66 Federal Probation 28 (2002) (hereinafter referred to as "Cullen")(emphasis supplied). Because both the literature and common sense show that opportunities for crime will be presented whenever a defendant returns to the area in which his offending began and grew (and in which his street credentials and sense of self may have been based on that very

11

criminality), removing him from that area can reduce both the opportunities for further crime and the expectation from those around him that he will re-offend. Thus, "[t]he effectiveness of probation and parole supervision will be increased to the extent that officers systematically. . . reduce the extent to which offenders are tempted by and come into contact with opportunities for crime." Id. at 31. See also La Vigne et al., "Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, Mar. 2006, at 25 ("most potential offenders are not highly motivated to commit crime but do so when they are presented with opportunities to offend easily."); Dickey et al, "Promoting Public Safety: A Problem-Oriented Approach To Prisoner Reentry in Prisoner Reentry and Community Policing: Strategies for Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, May 2004, at 61-62 ("when offenders first reenter communities, they themselves are vulnerable, for all of the reasons that have been suggested in literature on reentry: mental health problems, lack of family connections, drug and alcohol addictions, lack of education and employment. . . .Fixing these problems is often implausible. . . .Instead, we can alter environments [and] remove temptations. . . ").

As commonsensical as these notions are, effective implementation is equally straightforward. Rather than the rely exclusively on the sweeping provisions set forth in U.S.S.G. §5D1.3 (c) (8-9) (which, among other things, now require a defendant to know that the individual with whom he is associating has a felony conviction), the literature suggests that narrower restrictions are more effective--restrictions precluding a defendant from being with particular, identified people or specifically delineated areas that the record shows have previously led him into crime. Cullen at 33 (recommending that probation officers attempt "to

12

disrupt routine activities that increase crime opportunities" that are based on a defendant's past offending by, among other things, prohibiting contact with specific people (e.g., past co-offenders) and "prohibiting traveling on specific streets" (e.g., areas of past criminality) outlined on a map given to the offender. That is exactly what the government seeks to do here.

Of course, the government cannot advocate such restrictions without establishing their appropriateness. Appellate courts have routinely upheld such restrictions as a condition of probation or Supervised Release whenever, as here, the restriction served as a deterrent to protect the victimized community and/or rehabilitate the Defendant based on his prior offending. See United States v. Garrasteguy, 559 F.3d 34 (1st Cir. 2009) (affirming on plain error review 12-year restriction from Suffolk County imposed on Defendant who sold drugs at Bromley Heath Housing Development); United States v. Watson, 582 F.3d 974 (9th Cir. 2009)(validating restriction that prevented Defendant from entering city and county of San Francisco without the prior approval of his Probation Officer); United States v. Cothran, 855 F.2d 749 (11th Cir. 1988) (validating a probation restriction that prevented Defendant, convicted of cocaine distribution to minors, from traveling to Fulton County, Georgia, because his return to a high-crime neighborhood in southeast Atlanta would likely result in his continued criminal activity and the endangerment of neighborhood youth); United States v. Sicher, 239 F.3d 289, 292 (3d Cir. 2000) (upholding a Supervised Release restriction, after various drug convictions, that covered two counties in the Allentown, Pennsylvania, area because the "territorial limitation [was] clearly intended to promote [Defendant's] rehabilitation by keeping [Defendant] away from the influences that would most likely cause her to engage in further criminal activity"). See also United States v. Alexander, 509 F.3d 253, 256-57 (6th Cir. 2007) (affirming condition of

13

Supervised Release that required Defendant to live in city several hundred miles away from family for first 12 months of Supervised Release; court noted that condition: (a) "will further [Defendant's] rehabilitation efforts by temporarily removing him from the destructive influences that have plagued him"; and, (b) "holds the potential to protect the community from future crimes as well"). See generally 18 U.S.C. § 3563(b)(6) (authorizing conditions that a defendant refrain from associating unnecessarily with specified persons) & 13 (authorizing conditions that a Defendant refrain from residing in a particular area).[6]

The requested restrictions should also be imposed here because the need for them is fully supported by the record. See Summary of Historic Incident Reports and FIOs attached as Exhibit 3. Even ROBINSON's family has recognized that Bromley Heath is a problematic area for him. PSR at ¶77 (ROBINSON's Aunt understood he was "hanging around the projects" and "described how this environment is one filled with drugs and dangerous people and reported how

---

6 In approving the much broader geographic restriction imposed in Garrasteguy, the First Circuit described the legal framework for such conditions as follows:

> District courts have significant flexibility to impose special conditions of supervised release. A district court may impose as a condition of supervised release most discretionary conditions identified in 18 U.S.C. § 3563(b), or any other condition the court deems appropriate. All such conditions, however, must be "reasonably related" to the factors set forth in § 3553(a), may involve "no greater deprivation of liberty than reasonably necessary" to achieve the purposes of §§ 3553(a)(2)(c), (a)(2)(D), (viz. to protect the public and promote the rehabilitation of the Defendant), and must be consistent with any pertinent policy statement of the United States Sentencing Commission. 18 U.S.C. § 3583(d); see also United States v. York, 357 F.3d 14, 20 (1st Cir. 2004).

559 F.3d at 41 (footnotes omitted). A court should also explain the reason for imposing the conditions and, in doing so, discuss how they relate to the statutory sentencing factors contained in 18 U.S.C. §3553. See United States v. Thompson, 777 F.3d 368, 373-74 (7th Cir. 2015).

she would always encourage Javonte to come back to her home and stay away from the projects").

The restrictions are based ROBINSON's prior criminal contacts as shown on his historic Boston Police Department Reports and FIOs going back to 2010. See Summary of BPD Reports attached as Exhibit 3.   All of the persons on the Associational list are individuals who BPD records show ROBINSON was associating with usually in the area of the Development. Nearly all have felony convictions and are therefore persons with whom ROBINSON cannot associate with without the express permission of Probation.

### F.   Other Recommendations

Other recommended special conditions include continued education/vocational training, that ROBINSON receive help preparing for his GED, that ROBINSON be required to participate in Probation's cognitive behavioral program as directed by his Probation Officer, and that ROBINSON receive a judicial recommendation for RESTART or CARE.

### SUPERVISED RELEASE CONDITIONS PROPOSED FOR KEVIN SMITH

The government requests that SMITH be placed on Supervised Release and that he be required to comply with the following Special Conditions.   Although the recommended conditions are similar to those proposed for ROBINSON, they have been tailored to meet the specific information contained in SMITH's PSR.

### A.   SMITH should be required to reside at an RRC if a suitable residence is not available

Based on the PSR, it appears that that SMITH will have a viable residence upon release. PSR at ¶78.  If he does not, he should be required to stay in a Residential Center until a suitable residence is found.

15

### B. Curfew

For the reasons discussed above, the government also recommends that SMITH also be subject to a 9 p.m.-7a.m. curfew for the first 6 months of Supervised Release after he is released to the street. The Probation Office should have the power to relax the curfew (which should be enforced by electronic monitoring) for school, employment, or other legitimate reasons.

### C. Substance Abuse Treatment

Based on the information contained in the PSR, it does not appear that SMITH has any alcohol or substance abuse issues. PSR at ¶¶ 90-92. Nevertheless, Probation should be given the authority to perform drug tests to ensure that SMITH is not using drugs after he is released. Probation should also be given the authority to require that SMITH go to substance abuse treatment in the event that any tests are positive.

### D. Associational and Geographic Restrictions

For the reasons already described, SMITH should also be subject to Associational and Geographic Restrictions attached as Exhibit 6 that will keep him away from the Development and from his historic criminal associates. Every person on SMITH's Associational list has one or more felony convictions. He therefore cannot associate with any of them absent permission from Probation. The written restriction puts SMITH on notice of who these individuals are.

SMITH's Geographic Restriction is slightly more complicated than that proposed for ROBINSON. While the nature of the crimes SMITH committed in this case and his historic Incident Reports and FIOs show the need to keep him out of the area of the Development, he has an elderly parent, the mother of his child, and his infant child living inside the Exclusion Zone. PSR at ¶¶ 75, 80. The PSR also indicates that, prior to his arrest here, SMITH was assisting in the care of his parent. Id.

As important as it is that SMITH stay out of the Development, his family connection and ability to help care for an elderly parent deserve consideration as well. Therefore, the Geographic Restriction is drafted so that, provided that SMITH is in compliance with all of his Supervised Release Conditions, Probation will be permitted to establish a reasonable visitation schedule so that SMITH can visit the residence of his parent and participate in her medical care as required and also spend time with his child and her mother. Any such schedule should be limited to specific hours each week (preferably in the daytime if that can be arranged without disrupting with his work schedule) and during any such visit SMITH shall be required to go directly to the residence and leave the exclusion zone as soon as the visit is over. Should there be a medical emergency that required SMITH to enter the Exclusion Zone, he should make every effort to notify Probation as soon as possible and should be required to document the reason for the emergency upon request.[7] Probation should also be empowered to modify the visitation schedule based on SMITH's compliance with this and his other Supervised Release conditions.

### E. **Other Recommendations**

Other recommended special conditions include continued education/vocational training, that SMITH receive help preparing for his GED, that SMITH be required to participate in any cognitive behavioral program as directed by his Probation Officer, and that SMITH receive a

judicial recommendation for RESTART.

                                                          Respectfully submitted,

---

7 Imposition and monitoring of any visitation schedule will also be easier if SMITH is placed on GPS monitoring for the first 6 months of his Supervised Release.

                    ANDREW E. LELLING
                    UNITED STATES ATTORNEY

By: /s/John A. Wortmann, Jr.
     JOHN A. WORTMANN, JR.
  Assistant U.S. Attorney
   One Courthouse Way
   Boston, MA
   (617) 748-3207

## CERTIFICATE OF SERVICE

     The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

                    /s/ John A. Wortmann, Jr.   7/19/18
                    JOHN A. WORTMANN, JR